LODGED
CLERK, U.S. DISTRICT COURT

07/10/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

JUL 10 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ SIO _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of

*Four digital devices seized on or about June 11, 2020, as described further in Attachment A-1*

)
)
)
)
)
)
)

Case No.

## 2:20-mj-03183

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2261A(2) | Cyberstalking |
| 18 U.S.C. § 875(c) | Transmitting a Communication Containing a Threat |
| 18 U.S.C. § 876 | Mailing Threatening Communication |
| 18 U.S.C. § 1512(b)(3) | Tampering With a Victim by Intimidation/Threats |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Sabrina Ferguson, FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 7/10/2020

*Judge's signature*

City and state: Los Angeles, CA

Hon. John E. McDermott, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lauren Restrepo – 213-448-7723

## <u>ATTACHMENT A-1</u>

<u>PROPERTY TO BE SEARCHED</u>

The following digital devices, seized on or about June 11, 2020, and currently maintained in the custody of Pasadena Police Department in Pasadena, California:

1.    a MacBook laptop, model A1708, with serial number C02SJK7QGY25 ("SUBJECT DEVICE 1");

2.    a Wireless hard drive, model A1470, with serial number C86J21DWF9H6 ("SUBJECT DEVICE 2");

3.    a Mac desktop computer, model A1419, with serial number C02TH0QAGG7J ("SUBJECT DEVICE 3"); and

4.    a Black iPhone 7 with galaxy-themed case, model A1778, with serial number DNRSQMEMHG7K ("SUBJECT DEVICE 4").

i

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations 18 U.S.C. § 2261A(2) (Cyberstalking), 18 U.S.C. § 875(c) (Transmitting a Communication Containing a Threat to Injure), 18 U.S.C. § 876 (Mailing Threatening Communication), and 18 U.S.C. § 1512(b)(3) (Tampering With a Victim by Intimidation/Threats) (the "Subject Offenses"), namely:

a.   Any records, documents, programs, photographs, applications, or materials containing correspondence to or from the victims in this investigation;

b.   Any records, documents, programs, applications, or materials relating to threats to commit, or the commission of, acts of sexual or other physical violence, including against the victims in this investigation;

c.   And records, documents, programs, applications, or materials relating to the physical or sexual harassment or threatening of others, including the victims in this investigation;

d.   Any records, documents, programs, photographs, applications, or materials pertaining to social networking events in the Central District of California; and

e.   Any SUBJECT DEVICE, which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

f.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.  evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

           viii.     records of or information about Internet Protocol addresses used by the device;

            ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of each SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.   The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.   The search team may also search for and attempt to recover deleted, "hidden," or

iv

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Sabrina Ferguson, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint against and arrest warrant for SAMUEL TRELAWNEY HUGHES ("HUGHES") for a violation of 18 U.S.C. § 875(c) (Transmitting a Communication Containing a Threat to Injure).

2.   This affidavit is also made in support of applications for warrants to search:

   a.   The following digital devices in the custody of the Pasadena Police Department ("PPD"), in Pasadena, California, as described more fully in Attachment A-1:

      i.   a MacBook laptop, model A1708, with serial number C02SJK7QGY25 ("SUBJECT DEVICE 1");

      ii.   a Wireless hard drive, model A1470, with serial number C86T21DWF9H6 ("SUBJECT DEVICE 2");

      iii. a Mac desktop computer, model A1419, with serial number C02TH0QAGG7J ("SUBJECT DEVICE 3"); and

      iv.   a Black Apple iPhone 7 with galaxy-themed case, model A1778, with serial number DNRSQMEMHG7K ("SUBJECT DEVICE 4").

   b.   A black Apple iPhone ("SUBJECT DEVICE 5", and collectively with SUBJECT DEVICES 1-4, the "SUBJECT DEVICES"), in the custody of the Los Angeles Sherriff's Department ("LASD") in Los Angeles, California, as described more fully in Attachment A-2.

3.     The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 2261A(2) (Cyberstalking), 18 U.S.C. § 875(c) (Transmitting a Communication Containing a Threat to Injure), 18 U.S.C. § 876 (Mailing Threatening Communication), and 18 U.S.C. § 1512(b)(3) (Tampering With a Victim by Intimidation/Threats) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.     I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2018. From May through September 2018, I attended the FBI's Basic Field Training Course in Quantico, Virginia.  From October 2018 to the present, I have worked on a violent-crime squad in the West Covina Resident Agency of the FBI Los Angeles Division.

6.    Since becoming a SA with the FBI, I have participated in multiple investigations involving threats to injure or kill U.S. citizens within the Los Angeles area and beyond. Accordingly, I have received training in a variety of investigative techniques, including the use of open source tools, online exploitation, Telephone App/Tolls training, reviewing surveillance images and cellular telephone data, reviewing physical evidence, and witness interviews.  In addition, I have received both formal and informal training from the FBI regarding computer-related investigations and computer technology.

7.    Additionally, I have participated in investigations involving individuals illegally possessing narcotics and/or firearms, the illegal distribution of narcotics, homicides, kidnappings, internet crimes against children, bank robberies, extortion and violent robberies, as well as international and domestic terrorism.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    Since approximately May 2019, the FBI has been investigating HUGHES for cyberstalking and sending threats to at least ten women and two men (collectively, "the victims"). HUGHES sent electronic communications via numerous email, telephone, and social media accounts, as well as letters through the U.S. mail, threatening to injure, rape, or kill, each of the victims.  After being contacted by both the FBI and state law enforcement officers on multiple occasions regarding the threatening communications, HUGHES continued to send electronic

communications and letters threatening to injure, rape, or kill
at least three of the victims who had reported his threats to
the police.  In his communications to some victims, HUGHES
threatened that contacting the police would lead to the injury
or death of the victim or the victims' loved ones.

9.   HUGHES' conduct generally followed a pattern, whereby
(1) he met a victim (usually a woman) at a networking event or
through his employment; (2) after the event, or after having
been employed for a period of time, he would send a
communication (or communications) to the victim from an email or
social media account, usually in his true name, seeking further
social interaction; (3) the victim would not reciprocate HUGHES'
desire for further social interaction; and (4) HUGHES would then
send threatening communications to the victim, often from an
email address using a pseudonym as a means to disguise his
identity.  Outside of networking events and the workplace,
HUGHES would also threaten individuals he met, and had negative
interactions with, while patronizing local businesses.

10.  The threatening communications sent by HUGHES to the
victims were direct, graphic, and disturbing in nature,
including statements such as: "I am coming to get you, I will
enjoy every moment of killing you" and "I can guarantee you will
die soon at my mercy!"

11.  On or about November 17, 2019, HUGHES emailed victim
E.S. using the email account "xavier.herrera666@gmail.com" and
stated, "Don't ever report any threats to the police they wont
help you and that makes me more likely come after you and your

4

family. I hope when I see you, I rape you, slash your throat and pour gasoline over your half mutilated body... Either way you are gonna die, youre going to pay."

12.  On or about June 11, 2020, PPD officers arrested HUGHES at his residence based on his threats to another victim (S.L., discussed below).  PPD officers obtained a state search warrant for his apartment and car and seized, among other items, SUBJECT DEVICES 1-4.

13.  On or about June 25, 2020, HUGHES was arrested again, this time by Los Angeles Police Department ("LAPD") officers, based on some of the threats sent to victim E.S.  When arrested, HUGHES was in possession of SUBJECT DEVICE 5.

## IV. STATEMENT OF PROBABLE CAUSE

14.  Based on my review of law enforcement reports, conversations with other law enforcement agents and officers, interviews with victims, review of records obtained from providers, and my own knowledge of the investigation, I am aware of the following:

### A.   Background on HUGHES' Pattern of Threatening Victims with Violence

15.  Beginning in May 2019, the FBI began receiving complaints from individuals who claimed that HUGHES was sending electronic communications in which he threatened to injure, rape, or kill them.  In total, over the course of the investigation I have identified twelve victims who have been threatened by HUGHES.  Most of the victims have personally interacted with HUGHES, and the threatening communications

started when the personal interaction did not result in HUGHES'
desired outcome of further social interaction.

16.    In querying FBI, LAPD, and PPD records going back to
May 2019, I have identified approximately fourteen harassment-
related incident reports related to HUGHES' threatening numerous
victims with violence.[1]  Based on my review of these reports and
copies of the threatening communications, as well as additional
interviews with the victims, I learned the following:

        a.    HUGHES often followed a pattern of behavior
leading up to sending threatening communication to the victims,
which typically included the following actions:

            i.    HUGHES would attend a Los Angeles-area
networking event, which might be advertised to the public or
hosted by a private business, or he would gain employment at a
Los Angeles-area business.  As described below, HUGHES first met
six of the victims (C.G., E.S., C.N., K.C., J.C. and C.S.) at
social networking events, and three of the victims (D.B., J.L.,
and L.L.) through employment.  Two of the victims (S.S. and
E.A.) never met HUGHES in person, however they received
threatening messages due to their affiliation with one or more
of the aforementioned victims.  Additionally, one of the victims
(S.L.) was threatened by HUGHES after interacting with him in
her customer service job.

            ii.    At the networking events, HUGHES would meet
a female event attendee or co-worker and, at times, invite her

---

[1] Because some of the victims filed reports with multiple
agencies, these fourteen reports appear to have been filed by a
total of ten individuals.

6

to meet him at a future date in a one-on-one setting.  Multiple victims described HUGHES' aggressive in-person approach as making them feel uncomfortable.  The women who eventually became HUGHES' targets often shared their contact information with him at the networking events - either directly or indirectly - before realizing his intentions.

iii. If a woman rejected HUGHES' invitation, or otherwise indicated that they no longer wished to interact with him, he then contacted the victim using various online platforms.  HUGHES' public communications (often on social media) about victims were often coupled with private messages, using email accounts with pseudonyms, containing threats of violence.  HUGHES has used various methods to deliver his threats, including email, social media, SMS text, and the U.S. mail.

b.   From email and social media accounts used by HUGHES, victims have received electronic communications that contain threats against them, such as, "I will rip your fucking throat out and stab you in the eyes and put gasoline over your half mutilated body," and "rape you slash your throat and burn your car and house."  HUGHES has also threatened harsher retaliation if a victim reported his actions to law enforcement, such as, "Don't even bother contacting the police, I will kill your loved ones if you do."

c.   Additionally, in an attempt to prevent victims from providing information to the police regarding his threatening communications, at least two of the victims who have

contacted the police regarding HUGHES' conduct received additional threatening communications after law enforcement attempted to interview HUGHES regarding their complaints.

**B.   Victim Accounts of HUGHES' Threatening and Harassing Communications**

17.   The paragraphs below summarize, in relevant part, the substance of the reports that victims have made to the FBI, LAPD, or PPD.  They also summarize information obtained during interviews with the victims, as well as records obtained from various providers related to the online or telephone accounts used by HUGHES to communicate with the victims or send threatening communications.

**1.   Victim C.G.**

18.   On or about May 9, 2019, C.G. contacted the FBI to report that she had received a threatening email after meeting a man (later identified as HUGHES) at two business networking events in the Los Angeles area.  C.G. also filed a report with the LAPD.  Based on my review of the FBI and LAPD reports, FBI interviews with C.G. on or about May 24, 2019 and January 14, 2020, and the FBI's further investigation, I learned the following:

a.   C.G. first interacted with HUGHES on or around February 13, 2019, at an event in Beverly Hills, California.  At that event, C.G. spoke briefly with HUGHES.  He told her that he worked in the information technology field.  She told him that she worked in real estate and handed him her business card.

b.   C.G. saw HUGHES a second time on or around March 9, 2019, at another event in Beverly Hills, California.  HUGHES approached C.G. in a way that seemed to indicate that he knew her.  C.G. recalled that HUGHES seemed offended when she did not immediately remember his name.  She also recalled that it was difficult to understand him when he spoke due to his British accent.[2]  At some point during this event, HUGHES asked C.G. out on a date.  C.G. told HUGHES that she was not interested.

c.   HUGHES and C.G. were photographed together at the March 9, 2019 event, alongside the event organizer and an unidentified individual.  I have reviewed the photographs from the event.  The person in the photo that C.G. identified as the man she met at the networking events matches HUGHES' photograph on file with the California Department of Motor Vehicles ("DMV") and a photograph provided to me by the U.S. Department of State.

d.   On or about May 8, 2019, approximately two months after the second networking event in which C.G. interacted with HUGHES, C.G. received an email from "parsonstheo38@gmail.com." According to C.G., the email said, "I hope you rot and die. I swear if I see you ever I will stab ya in the neck."  In her initial reports to the FBI and LAPD, C.G. stated that she did not recognize the email address that sent the message.

_____

[2] Based on documentation received through a U.S. Department of State records request, HUGHES is a citizen of the United Kingdom who is currently in the U.S. on a Non-Immigrant E-2 Investor Visa which was issued in October 2018, and is set to expire in or around October 2020.  HUGHES applied to have his Investor Visa renewed on or about May 1, 2020.

19.   On or around May 11, 2019, the FBI obtained
information from Google LLC related to the
"parsonstheo38@gmail.com" email account and Internet Protocol
("IP") addresses[3] used to access the account.  The account
information listed the subscriber name as "Theo Parsons" with no
additional identifying information.

20.   On or around May 11, 2019, through a law enforcement
database, the FBI determined that Charter Communications was the
Internet Service Provider ("ISP") associated with the IP
Addresses provided by Google that was used to access the
"parsonstheo38@gmail.com" email account.  The FBI obtained from
Charter Communications subscriber information associated with
that IP Address, including the following results: Subscriber
name: Sam Hughes; Subscriber telephone: 626-318-1417 (the
"HUGHES Phone"); and Subscriber address: 250 North Oakland
Avenue 8, Pasadena, California 91101 (the "HUGHES Residence").

21.   After receiving the above subscriber information from
Charter Communications, through a law enforcement database, the
FBI determined that AT&T Wireless was the carrier for the HUGHES
Phone.  On or around May 13, 2019, the FBI received information
from AT&T Wireless related to the HUGHES Phone, including the
following response: Subscriber name: None; Service type: Pre-

---

[3] An IP address, or Internet Protocol address, is the
globally unique address of a computer or other device connected
to a network, and is used to route Internet communications to
and from the computer or other device.

paid; and Subscriber address: 250 N Oakland Avenue, Pasadena, CA
(i.e. the HUGHES Residence).[4]

22.   On or about May 12, 2019, upon questioning, C.G.
informed the FBI that someone with the profile name "Sam Hughes"
had started following her public/business Facebook page and left
a comment in response to one of her posts on or around May 10,
2019.  She initially told the FBI that she did not know that
person or anyone by that name.  However, a few days later, on or
about May 24, 2019, during an interview with FBI Special Agent
Michael Alker, Agent Alker mentioned HUGHES was from England.
Soon after the interview, C.G. called Agent Alker and said she
remembered she met a man with a British accent named Sam Hughes
at two separate business networking events (detailed above).

23.   On or about May 22, 2019 at approximately 7:00 a.m.,
Agent Michael Alker attempted to contact HUGHES regarding the
threatening electronic communications sent to C.G.  Agent Alker
knocked on the front door of the HUGHES Residence, but no one
answered.  Agent Alker left his official FBI business card at
the front door of the HUGHES Residence, with his cellular phone
number written on the back.  Agent Alker located a 2013 grey
Ford Focus in the parking area of the complex that was
registered to HUGHES (based on records obtained from the

---

[4] In or around March 2020, I obtained additional records
from AT&T for the HUGHES Phone for the time period February 1,
2019 through March 9, 2020.  The records showed the account was
active and listed "Sam Hughes" as the billing party and user.
The records also listed the billing address as 250 N Oakland
Avenue, Pasadena, CA 91101 and the user email as
"hughes_sam123@hotmail.co.uk."  The call detail records listed
the device as an Apple IPhone 7 (the same make and model phone
as SUBJECT DEVICE 4).

California DMV) and left his official FBI business card, again
with his cellular phone number written on the back, on the
windshield of HUGHES's car.  Before departing, Agent Alker also
attempted to contact HUGHES by calling the HUGHES Phone (626-
318-1417).  When the call was not answered, Agent Alker left a
voicemail message identifying himself and requesting that HUGHES
return his call and then left the apartment complex at
approximately 8:15 a.m.  At approximately 8:17 a.m., Agent Alker
received the following text message from the HUGHES Phone:

> "Hi Michael. Thank you for your card and early
> morning visit at 7am, very sobering. I like to
> exercise my constitutional rights under 4th amendment
> rights I can say if you wish to communicate with me
> then continue to do so via SMS. You gave me a cell-
> phone I can reach you on the back of your card. I
> appreciate that a lot thank you. I am under no
> obligation to speak with you on the phone(Unless I
> have a lawyer present). Hope you understand and I
> respect the role you are in."

Agent Alker responded with the following text message to HUGHES,
to which HUGHES did not respond:

> "Sam, I stopped by to interview you regarding
> threatening electronic communications. If you would
> prefer to speak with an attorney present, please let
> me know what day and time works for you. Thank you."

### 2.  Victim C.S.

24.  A few months later, on or about June 28, 2019, victim
C.S. reported to the PPD that HUGHES had sent her several
communications in which he had threatened to kill her.  Based on
my review of the PPD report, as well as a subsequent interview I
conducted with C.S. on or about May 14, 2020, I learned the
following:

a.   C.S. attended a networking event in Pasadena, California on or around April 5, 2019, where she was approached by a man who identified himself as Sam Hughes.  They exchanged business cards and connected on LinkedIn via a LinkedIn account identified with username "Sam Hughes" with account ID "sam-hughes-03622326."  The next day, on or about April 6, 2019, HUGHES sent C.S. a LinkedIn message and commented that she was "cute" and invited her to meet with him for coffee.  According to C.S., she felt uncomfortable with HUGHES' comments and blocked him from being able to view her profile or send her messages on LinkedIn.

b.   On or about April 7, 2019, C.S. received an email from the email address "hughes_sam123@hotmail.co.uk" in which HUGHES self-identified as "Sam Hughes," and apologized for his comments about her being cute and asking to meet for coffee. According to C.S., she did not respond.

c.   On or about April 11 and April 22, 2019, C.S. received two separate emails from "theoparsons4@gmail.com."  The sender stated, in part, "why the fuck haven't you replied to my last email," said C.S. was an "Italian piece of shit," and stated, in part, "I am going to cut out your throat . . . I am coming to get you . . . I will enjoy every moment of killing you."  According to C.S., she believed that HUGHES sent these threats from the "theoparsons4@gmail.com" email account in retaliation for blocking him from communicating with her via LinkedIn.  Additionally, C.S. recalled talking to HUGHES about her Italian heritage at the networking event and believed that

13

HUGHES' reference to her ethnicity could have emerged from that conversation.

        d.   On or about June 26, 2019, C.S. received another email from the "hughes_sam123@hotmail.co.uk" account in which HUGHES asked, "how come you haven't replied to last email I did say I was sorry for being what you felt inappropriate." HUGHES also stated, in part, "please could you just unblock me." HUGHES further noted that, since he attends the weekly networking event where they met, "it's ideal that I should be treated with some respect." HUGHES' first and last name was included in the email signature of the email. According to C.S., she did not respond.

        e.   On or about June 27, 2019, C.S. received a text message from 626-318-1417 (the HUGHES Phone). At the time, she did not recognize the telephone number. The message stated, in substance, that the sender was upset for being blocked on LinkedIn. At this point, C.S. decided to block this telephone number and report HUGHES to the PPD.

        f.   On or about June 28, 2019, C.S. filed a report of harassment with the PPD. At that time, C.S. told PPD officers that she was afraid for her life and had stopped attending events in Pasadena for fear of running into HUGHES. That same day, PPD officers went to HUGHES' Residence to interview him. HUGHES declined to open his door or leave the apartment to speak with the officers. According to the PPD officers, they spoke with HUGHES for approximately ten minutes through a window, but he largely refused to answer their questions.

g.    HUGHES recorded a portion of his exchange with the PPD officers, which he posted to the "SamHughes998" YouTube page shortly thereafter.  The caption to the video stated, in part, "Police officers came to visit me at my door over an alleged incident of harassment… When faced with it, protect your 4th Amendment of your constitutional right, answer no questions, do not chat to them or give your version of events and get their name and badge number, the longer you keep them in circles the more they will go away."

h.    A few days later, on or about July 2, 2019, C.S. received an email from "sam.hughes90031@gmail.com."  The subject line of the email read, "Your Police Report," and the writer self-identified as "Sam Hughes."  In the email, HUGHES accused C.S. of being "such a fucking cunt for reporting me to the police."  He stated that officers had tried to contact him at his home and, as a result, he "had the perfect opportunity to film them where it's gone viral on YouTube."  He also referenced his earlier LinkedIn message to C.S. on or around April 6, 2019, stating that this would be his "final correspondence" to her.

i.    A few months later, on or about October 19, 2019, C.S. observed that HUGHES had mentioned her and another victim (E.S., discussed below) in a post on the Instagram account "hughes_sam123."  The post stated, in part, that C.S. and E.S. were "miserable cunts who have an attitude of a bitchy teenager thinking harassment is a tool against contact that is far from inappropriate."  This post was included within a series of posts that made derogatory accusations about American women, such as

15

"Every American woman is a fucking cunt without a doubt!" and
"All you American women I met should just fuck off and die you
ugly miserable 2 faced cunts. . ."

    j.   On or about November 29, 2019, C.S. received an
email from "tony.hawk.exskater@gmail.com."  The sender stated
the "threats and abuse you endure will never go away because
someday you will guaranteed get your throat cut out and duct
taped, raped and met by the person who you victimized you
fucking cunt."  The sender also referenced the YouTube video
posted by HUGHES that showed officers contacting him at his
residence and stated that C.S. was "the biggest Italian cunt in
the world" for "going to police over some emails."  The sender
ended the email by stating that he hoped C.S. suffered "a
gruesome death."

    k.   According to C.S., she believed the person who
sent all the messages to her was Sam Hughes (HUGHES), the man
she had exchanged information with at the Pasadena networking
event in April 2019.  C.S. recalled that she was "in shock" when
she received the first series of threats.  C.S. said that she
"panicked" and immediately called her husband.  According to
C.S., in the following weeks, she stopped attending most, if not
all, Pasadena area networking events and is still worried about
going to work for fear that HUGHES could be trying to find her.
C.S. also said that she had considered moving out of fear that
HUGHES would find out where she lived and act on his threats to
harm her.  C.S. said she has also taken steps to remove all of
her personal information from the internet as a safety

precaution because she is frightened of HUGHES being able to locate her.

25. I have reviewed the "SamHughes998" YouTube account numerous times throughout this investigation. Upon each review, I have observed that account profile name includes HUGHES' first and last name and the profile photo for the account matches the photograph on file with the California DMV for HUGHES. Additionally, in the "About" section of the account's profile page, the user wrote that he is from the UK, lives in Pasadena, California, and is a web developer and entrepreneur. The YouTube channel for HUGHES's business (Cloud Connected LLC) is also featured in the "About" section.

26. On March 11, 2020, United States Magistrate Judge Patrick J. Walsh issued search warrants in Case Numbers 20-MJ-1096, 20-MJ-1097, 20-MJ-1098, 20-MJ-1099, for Google, Facebook, Instagram, Hotmail, and LinkedIn accounts (the "Email and Social Media Search Warrants") used post comments about, send messages to, or otherwise communicate with the victims.

27. Review of subscriber and IP login records provided by Google, LinkedIn, Facebook, and Microsoft (provider of Hotmail webmail service) in response to the Email and Social Media Search Warrants revealed that:[5]

    a. The "sam-hughes-03622326" LinkedIn account is registered to "Sam Hughes." The primary telephone number is the

---

[5] Review of the records obtained in response to the Email and Social Media Search Warrants is ongoing. To date, I have reviewed the basic subscriber data and IP address logs for approximately thirteen of the accounts.

HUGHES Phone.  The records reveal additional accounts linked
this account, including the "sam.t.hughes500" Facebook account,
"sam@cloudconnectedtech.com", and the
"sam.hughes90031@gmail.com" account.  Additionally, two of the
IP addresses used to log into this account (47.41.193.249 (the
"249 IP Address") and 71.83.153.207 (the "207 IP Address"))
match IP addresses used to log in to other accounts used to
contact other victims, including victims J.C. and E.S.

        b.   The "hughes_sam123@hotmail.co.uk" Hotmail account
is registered to "Sam Hughes."  The billing names associated
with this account are "sam hughes," "mr samuel t hughes," and
"mr sam trelawney hughes."  The primary billing address is the
HUGHES Residence.  Additionally, the IP logs for this account
indicate that the 249 IP Address was used to log in to this
account.

        c.   The "hughes_sam123" Instagram account is
registered to "Sam Hughes" and the HUGHES Phone is listed as the
telephone number.  The name "Julius" is listed among the
alternate usernames for this account.[6]  The records reveal
additional accounts linked this Instagram account, including
"sam.hughes90031@gmail.com," the "sam_hughes911" Twitter
account, the "byword.photography" Instagram account,[7] and
Instagram account "cloudconnectedseo."  Additionally, the IP

---

        [6] As detailed below, Instagram account "julius.caesar411"
and ProtonMail account "julius.caesar411@protonmail.com" were
used to send threatening messages to victims J.C. and E.C.

        [7] As detailed below, this Instagram account was used to
follow victim E.S.

logs for this account indicate that the 249 IP Address and the 207 IP Address were also used to log into this account.

      d.   Records for the "sam.hughes90031@gmail.com" email account revealed numerous other accounts linked this email account, including, "drummer.sam500@gmail.com," "photographer.sam90031@gmail.com," "hughcloudconnect@gmail.com," "info@cloudconnectedtech.com," and "sams.cat.channel@gmail.com." Additionally, several of the IP addresses used to log into this account, including the 249 IP Address, as well as IP Addresses 84.17.62.144 (the "144 IP Address"), 84.17.62.134 (the "134 IP Address"), 185.93.3.110 (the "110 IP Address"), and 82.221.102.40 (the "40 IP Address") match IP addresses used to log in to other accounts used to contact other victims.

### 3.   Victims C.N., J.C., and S.S.

28.  On or about January 22, 2020, an employee at "Company A," a business that provides co-working office space in Pasadena, reported to the FBI that HUGHES had threatened multiple individuals affiliated with Company A, specifically J.C. and C.N.  The employee reported that J.C. had previously filed a similar report with PPD on or about November 6, 2019. Based on my review of the FBI and PPD reports, as well as my interviews with the Company A employee who filed the FBI complaint and victim C.N. on or about February 7 and June 3, 2020, respectively, I learned the following:

      a.   On or around August 2, 2019, victim C.N. met HUGHES at one of Company A's networking events.  They met at the check-in table and began conversing about their respective

professions since they worked in similar fields.  C.N. was a
freelance marketing professional who was hoping to network for
more clients, so she gave HUGHES a business card that displayed
her full name, personal email address, personal telephone
number, and website URL.  During their conversation, HUGHES told
C.N. that he was from England and had two cats.[8]  He also invited
her to meet him for coffee sometime.  C.N. reported feeling
increasingly uncomfortable sitting next to HUGHES at the event.
According to C.N., one of the reasons she felt uncomfortable was
that she would periodically catch HUGHES staring at her chest.
She had also noticed cuts on HUGHES' left wrist that C.N.
thought might be from self-harm.  When the event concluded, C.N.
went into the bathroom and waited for HUGHES to leave so that
she would not have to walk to the parking garage with him.

        b.   A day or two after the August 2 event, C.N.
received a SMS text from telephone number 626-318-1417 (the
HUGHES Phone).  According to C.N., the sender identified himself
as HUGHES and stated, in effect, that he had enjoyed meeting
her.  C.N. recalled that she had sent HUGHES a neutral response
back.  On or about August 4, 2019, HUGHES sent C.N. another text
message inviting her to go salsa dancing with him.  C.N.
politely declined and then blocked HUGHES' number.

        c.   On or about August 31, 2019, C.N. received an
email from the "sam.hughes90031@gmail.com" account."  The
subject line stated, "You are a fucking cunt" and the email

---

        [8] Based on a review of various videos posted to the
"SamHughes998" YouTube account, it appears that HUGHES owns two
cats named Charlotte and Parker.

stated, in part, "I regret connecting with you and I hope you die you ugly bitch! Cunt! Cya! Sam." According to C.N., she forwarded the message to Company A, and later learned that the company banned HUGHES from attending their events.

       d.   HUGHES' conduct was eventually reported to S.S., an administrator at Company A. Around this same time, HUGHES posted on Company A's social media platform that people should be careful of C.N., stating "...she's dangerously coquetry with other guys and deceitful with her career." C.N. later told the FBI that HUGHES had also been following her on Facebook before she blocked him. She also said she blocked the "sam.hughes90031@gmail.com" email account after receiving his threatening email.

       e.   In response to HUGHES' harassing behavior and messages to C.N., S.S. consulted with J.C. (another administrator at Company A) regarding HUGHES' behavior and it was decided that Company A would disassociate with HUGHES. On or about September 8, 2019, S.S. emailed HUGHES stating that he was not welcome at any of Company A's future networking events and would be removed from their membership. According to J.C., the email addresses that Company A had on file for HUGHES were the "hughes_sam123@hotmail.co.uk" account and the "sam.hughes90031@gmail.com" account. Company A's files also listed HUGHES' telephone number as the HUGHES Phone and his last

21

known address as 250 N Oakland Ave (on the second floor),
Pasadena, CA 91101.[9]

      f.   After being removed from Company A's membership,
and being told he was not welcome at any of their future
networking events, HUGHES began to threaten S.S. and J.C.
Specifically, on or around September 9, 2019, the day after S.S.
informed HUGHES he was no longer welcome at Company A events,
S.S. began receiving harassment from HUGHES online.  In multiple
Facebook reviews posted to Company A's business profile via the
"sam.t.hughes500" Facebook account, HUGHES claimed that S.S. was
"a stubborn rude piece of shit CEO" who was "incriminating me as
a threatening person."  HUGHES also encouraged people to "come
to Cloud Connected instead I am owner and founder of the new
startup in Pasadena."[10]

      g.   A month later, on or about October 4, 2019,
HUGHES sent J.C. an email from the "sam.hughes90031@gmail.com"
account seeking confirmation about whether he was banned from
attending all of Company A's events.  HUGHES explained that he
had "moved from the UK to Pasadena" and those meet-ups were a
way for him to connect with other professionals.

      h.   On or about October 16, 2019, J.C. confirmed to
HUGHES via email that HUGHES was banned from attending all
Company A events.  Later that day, HUGHES sent J.C. two emails

---

[9] While this address does not list an apartment number, it
otherwise matches the HUGHES Residence.

[10] Based on a review of California Secretary of State Office
records, I learned that HUGHES filed business registration
documents for "Cloud Connected LLC" as recently as February
2019.

from the "sam.hughes90031@gmail.com" email account,
approximately 11 minutes apart.  In the first message, HUGHES
stated that he would "leave negative reviews all over the place
on social media as a consequence" of Company A's decision to ban
him from their networking events.  HUGHES made additional
threats to "damage your reputation online" before closing the
email with "FUCK YOU [J.C.] AND [S.S.]!"  In his second message,
HUGHES again asked for Company A's ban to be lifted and stated,
in part, "I hope you understand where it will go for you if you
don't sympathise[11] and show understanding in the matter. The
reviews will stay until you decide to allow me back."

      i.   On or about October 17, 2019, S.S. received a
message from the "sam.hughes90031@gmail.com" account.  HUGHES
accused S.S. of being an "asshole" for "getting me banned" and
promised to "damage your reputation because I specialize in
reputation management."  In the message, the sender identified
himself as "Sam Hughes."

      j.   On or about November 1, 2019, S.S. received an
email from the email account "tony.flavelle450@gmail.com."  In
part, the message stated, "I will bash your fucking lights out
[S.S.] you big fat ugly cunt. ANd cut your throat open! You are
on my waiting list. Thats ya warning I can guarantee you will
die soon at my mercy!"

      k.   The next day, on or about November 2, 2019, S.S.
contacted the PPD regarding HUGHES' threats.  S.S. provided a

---

[11] "Sympathise" is the British spelling of sympathize.

statement to the PPD officers, as well as copies of correspondence he had received.

l.   On November 4, 2019, PPD Officer Emanuel Nanez sent an email to "sam.hughes90031@gmail.com," copying the "tony.flavelle450@gmail.com" email account.  In the email, Officer Nanez told HUGHES that he needed to speak with him regarding S.S.'s complaint and invited HUGHES to meet him at the Pasadena police station on November 8, 2019.[12]

m.   On or about November 4, 2019, J.C. received an anonymous letter in the U.S. mail at Company A.  J.C.'s name and address were handwritten on the envelope but the letter itself was typed and appeared printed on white computer copy paper. The letter was addressed to J.C. and stated, "It has come to my attention you had banned someone I know very well from [Company A] when he had been going through a rough time and I have decided to write to you anonymously to inform you that I am going to end your life.  I will rip your fucking throat out and stab you in the eyes and put gasoline over your half mutilated body.  I will also go and end the lives of your fucked up cunt ass loved ones who brought you up to treat others like shit you brought this on yourself you Chinese pancake faced cunt go back to china and don't be a [Company A] manager ever again you will

---

[12] Upon reviewing the "hughes_sam123" Instagram account, I observed that HUGHES had posted a screenshot of the November 2, 2019 email from PPD Officer Nanez with the following caption: "If you ever receive an email from police like this, I had back in November requesting you to go to the department DONT DO IT! Nothing will happen if you don't co-operate as you're remaining quiet and giving the police no satisfaction to build a case against you."

get this until you change!!! And pay put compensation for your
Stupidity!!!  Yours Sincerely; Your Nemisis!"

       n.   On or about November 6, 2019, J.C. also contacted
the PPD to report HUGHES' threats.  J.C. provided officers with
the physical letter that had been mailed to her, as well as
copies of the email correspondence she had received.

       o.   On or about November 10, 2019, J.C. received an
email from the email account "xavier.herrera666@gmail.com."  The
email contained similar threats as the anonymous letter mailed
to J.C. at Company A.  In the email, the sender stated, in part:
"I am writing to tell you, that you are a fucking Chinese cunt
who should be deported and get their throat cut, in fact you are
going to get your throat cut soon. Not a matter of if, but when
and when you are at first duct taped, raped and brought into me,
the vicious brutal killing of you will start. So don't bother
reporting this to the police coz I will kill your spouse if you
have one. Horrible thing will happen if you throw me in jail. I
hope you fear for your life because you ruined a friends life of
mine with your fucking up banning. CUNT BITCH ASSHOLE
MOTHERFUCKER I hope you love having a cock down your vagina
against your will!! Oh and [S.S] is a paedophile[13] you should
never stand up for that cunt!!"

       p.   On or about November 12, 2019, PPD Officer
Raymond Cardenas made multiple attempts to reach HUGHES via
telephone.  According to Officer Cardenas, his attempts were
unsuccessful.

---

[13] "Paedophile" is the British spelling for pedophile.

q.   On or about December 12, 2019, J.C. received an email from "julius.caesar411@protonmail.com" with similar threats as the anonymous letter and email from "xavier.herrera666@gmail.com" she had received the month prior. Specifically, in the email, the sender called J.C. a "chinese cunt" and stated, "I will rip out your fucking throat, stab you in the eyes and don't think I wont do it because I know where you work and you will regret what you did for the rest of your life, and same with your family . I will kill your lioved ones if yoiu even contact the police about it. you chinese cunt you fucking piece of shit!!!!!!"

29.   According to J.C, she believed that HUGHES sent the aforementioned threatening letter and emails because she received them after HUGHES had been banned from attending Company A's networking events.  J.C. also reported to the PPD that she felt uneasy and was in fear for her safety, especially after receiving the letter in the mail.

30.   According to S.S., he also believed the emails were coming from HUGHES because HUGHES had sent harassing messages to S.S. using the "sam.t.hughes500" Facebook account and the "sam.hughes90031@gmail.com" email account.  S.S. stated that he was in fear for his life and believed that HUGHES would carry out his intent to kill him based on the descriptive nature of the threats.

31.   In addition to the accounts detailed above, subscriber and IP login records provided by Google and Facebook in response

to the Email and Social Media Search Warrants also revealed
that:[14]

       a.   The "sam.t.hughes500" Facebook account was
registered to "Sam Hughes" and the billing name was listed as
"Mr Sam T Hughes."  The telephone number listed for the user was
the HUGHES Phone and the user's current city was listed as
"Pasadena, California".  The date of birth for the subscriber
matches HUGHES' date of birth according to California DMV
records.  The records reveal additional accounts linked this
Facebook account, including the "sam.hughes90031@gmail.com"
account, "drummer.sam500@gmail.com," and
"photographer.sam90031@gmail.com."  Additionally, the IP logs
for this account indicate that the 249 IP Address and the 207 IP
Address were used to log into this account.

       b.   No subscriber, billing, or linked account
information was provided by Google for the
"xavier.herrera666@gmail.com" email account.  However, the IP
logs for this account indicate that the 249 IP Address, the 144
IP Address, the 134 IP Address, and the 110 IP Address were all
used to log into this account.

---

[14] To date, we have not obtained records related to the
"julius.caesar411@protonmail.com" account.  Based on my training
and experience, and conversations with other law enforcement
agents, I have learned that ProtonMail is a Swiss-based email
service that provides sophisticated end-to-end encryption
between users and ProtonMail servers.  While it is sometimes
possible to obtain limited subscriber data, ProtonMail's network
architecture is designed to make data/emails stored in users'
accounts inaccessible to third parties, including law
enforcement and ProtonMail itself.

### 4. __Victim E.S.__

32.  On or about November 18, 2019, victim E.S. contacted
the FBI through her attorney to report that HUGHES had sent her
multiple death threats on various social media platforms
following their brief encounter at a writing workshop in Los
Angeles.  On or about December 13, 2019, I interviewed E.S.
Following this interview, E.S. provided records to the FBI of
the email communications she had received, as well as the social
media messages that mentioned her, and other victims, by name.
Based on E.S.'s initial report, my interview of and subsequent
contacts with E.S., as well as the records that E.S. provided, I
learned the following:

   a.   E.S. attended a writing workshop in the Los
Angeles area on or about October 2, 2019.  When a man later
identified as HUGHES arrived, he sat next to E.S. even though
there were many empty chairs in the room.  E.S. noticed cut
marks on his forearms that ran perpendicular to the length of
his arm.[15]  HUGHES and E.S. talked briefly at the event.

   b.   During the workshop, E.S.'s LinkedIn profile was
displayed at the front of the room when her work was being
discussed.  The day after this workshop, E.S. received a

_____

[15] According to a PPD report, on or about October 8, 2019,
HUGHES was transported to Huntington Memorial Hospital and
placed on a WIC 5150 hold for being a danger to himself.
According to the report, PPD was dispatched to the HUGHES
Residence to conduct a welfare check on HUGHES after it was
reported that HUGHES had posted on social media that he was
possibly going to hurt himself.  During the contact of HUGHES,
PPD officers observed multiple horizontal cuts on HUGHES' left
forearm.  In the PPD report, it was noted that HUGHES had
multiple social media accounts, including the "hughes_sam123"
Instagram account.

LinkedIn message from the LinkedIn account "Sam Hughes" (account
ID "sam-hughes-03622326").  In the message, HUGHES invited E.S.
to meet with him to discuss a film proposal.  E.S. recognized
the sender's LinkedIn profile photo as the man who had sat next
to her at the workshop.  E.S. also noticed that the occupation
listed next to HUGHES' name on the LinkedIn account was "CEO at
Cloud Connected."[16]  That same day, E.S. received a notification
indicating that HUGHES had started following her on Instagram
via the "hughes_sam123" Instagram account.

          c.   According to E.S., HUGHES began leaving comments
on E.S.'s Instagram posts complimenting her appearance.  These
comments made E.S. uncomfortable so, on or about October 6,
2019, she deleted the comments and blocked the "hughes_sam123"
Instagram account from viewing her Instagram profile.

          d.   On or about October 8, 2019, E.S. responded to
HUGHES' LinkedIn message and informed him that she was not
available to meet with him.  According to E.S., HUGHES replied
to her message on or about October 10, 2019, and appeared
understanding.  E.S. stated that she did not respond to this
message.

          e.   A few days later, HUGHES started following E.S.
on Instagram again, but from a different account named
"byword.photography."  E.S. said that she believed the second
account was operated by HUGHES because "Sam Hughes" was the

_____

          [16] I have reviewed the "Sam Hughes" LinkedIn account and
confirmed that the profile photograph matches the photograph of
HUGHES on file with the California DMV. I also confirmed that
the occupation listed next to HUGHES' name was "CEO at Cloud
Connected."

username displayed for the profile.  E.S. said she blocked the second account on or about October 17, 2019, after noticing that HUGHES, via the "byword.photography," account, was watching her Instagram stories.[17]

     f.   That same day, on or about October 17, 2019, HUGHES emailed E.S. from the "sam.hughes90031@gmail.com" account to express disapproval that E.S. had blocked him.  According to E.S., HUGHES also wrote that he had blocked her Facebook and LinkedIn accounts and would no longer contact her.  E.S. also said that around that same time, HUGHES also posted a negative review on the Facebook page for E.S.'s business using the "sam.t.hughes500" Facebook account.

     g.   On or about October 18, 2019, E.S. sent an email to HUGHES at the "sam.hughes90031@gmail.com" account.  According to E.S., in the email, she asked HUGHES to stop contacting her and informed him that she was saving his messages should she need to report him for harassment.

     h.   The next day, on or about October 19, 2019, E.S. received an email from the "sam.hughes90031@gmail.com" account in which HUGHES stated that he would no longer contact E.S. According to E.S., in the email HUGHES also mentioned he had a history of mental illness[18] and stated that this was not the

_____

[17] Instagram's "Stories" feature allows users to share multiple photos and videos in a slideshow format, which disappear after approximately 24 hours (unless saved by the user).

[18] The FBI has received communications from authorities in the United Kingdom that indicate that HUGHES may have autism and/or related psychological issues.  Nonetheless, I believe the

first time a woman had reported his harassment to the police. In the email, HUGHES also provided the HUGHES Phone as his telephone number in case E.S. wanted to meet in person or call him.  According to E.S., she did not respond.

   i. On or about October 19, 2019, E.S. also observed a series of negative Facebook posts about American women on the "sam.t.hughes500" Facebook profile page.  Around this time, E.S. also saw that HUGHES had posted a publicly accessible photo of E.S. via the "hughes_sam123" Instagram account with the text "cunt" photo shopped across her face and a caption advising that HUGHES "will defame her indefinitely."

   j. At that point, E.S. decided to report HUGHES' conduct to the LAPD.  She filed a report of harassment with the LAPD on or about October 22, 2019, naming HUGHES as the sender of the threatening communications.

   k. According to E.S., since October 19, 2019, HUGHES has contacted her numerous times both directly and indirectly, and from a variety of email addresses and social media accounts.

   l. On or about October 30, 2019, E.S. received an email from "Tony Flavelle" from the email account "tony.flavelle450@gmail.com" (used to send messages to victim S.S.).  E.S. did not recognize this email address.  The email stated that E.S. was a "diabolical motherfucking cunt, and someone I can guarantee will come out and first bash you head in, rape you slash your throat and burn your car and house.  You

---

evidence described in this affidavit indicates that there is probable cause to believe that he committed the Subject Offenses.

brought this on yourself and it aint going to stop not even a damn stinking police report will put an end to your wrath and I hope you fucking die you cunt!!"

        m.   From approximately November 10-24, 2019, E.S. also received at least five threatening emails from the "xavier.herrera666@gmail.com" email account (the same account used to send messages to victim J.C.). E.S. did not recognize this email address. A November 10 email stated that E.S. should "kill yourself you fucking bitch you are a nonce[19] and dont deserve to live or else my gang will do it for you." The email also warned E.S. not to file a police report or else "horrible things will happen."[20] A November 17 email stated "Don't ever report any threats to the police they wont help you and that makes me more likely come after you and your family. I hope when I see you, I rape you, slash your throat and pour gasoline over your half mutilated body... Either way you are gonna die, youre going to pay."

        n.   On or about November 11, 2019, E.S. was contacted by a colleague. The colleague forwarded a copy of an email that had been sent to him the previous day regarding E.S., from the

---

    [19] "Nonce" is a British slang word used to describe a pedophile.

    [20] As detailed above, this is the same day that victim J.C. also received the email from "xavier.herrera666@gmail.com" which stated J.C would be raped and get her throat cut.

"xavier.herrera666@gmail.com" email account, in which the writer accused E.S. of being a "meth-addicted child molester."[21]

o.   On or about November 12, 2019, E.S. filed a second report with the LAPD regarding HUGHES' threatening messages.

p.   On or about December 8, 2019, E.S. received another email from "sam.hughes90031@gmail.com." HUGHES admonished E.S. for removing the negative Facebook review that had been posted about her business by the "sam.t.hughes500" Facebook account in mid-October. The email stated that "this will still keep going" unless E.S. apologized.

q.   Around early December 2019, E.S. received a request to view her Instagram content from an Instagram account identified as "julius.caesar411." Around the time of this request, E.S. also received two emails from the email account "julius.caesar411@protonmail.com." In one email, the writer told E.S., in part, "I will cut your fucking throat out, sever your windpipe and smother you in gasoline and light your half mutilated corpse you fucking cunt . . ."

r.   Several months later, on or about May 16, 2020, after learning that E.S. had reported his threats to law enforcement, HUGHES sent an email from the "sam.hughes90031@gmail.com" account wherein he told E.S., in part, "I hope you fucking die you little miserable cunt getting

---

[21] In the affidavit in support of the Email and Social Media Search Warrants, E.S.'s colleague's email account ("[colleague's name]@gmail.com") was identified as a potential account used by HUGHES. Upon further investigation, it was determined that the account belonged to E.S.' colleague, not HUGHES.

the law involved in this like I'm some crackdown."  He also
wrote, "I hope you realise from such anonymous death threats you
received how disgusting it is to wrong me like this and you got
what you deserve you fucking cunt."

        s.  E.S. characterized HUGHES' harassment as
extremely taxing and a very hard thing to experience.  E.S.
stated that she has attempted to remove her personal information
from every online people finder website and changed her Facebook
and Instagram account settings to private.  E.S. also said she
initiated the process of obtaining a restraining order against
HUGHES.

       33.  In addition to the records described above, Subscriber
and IP login records provided by Facebook in response to the
Email and Social Media Search Warrants revealed that:

        a.  The "byword.photography" Instagram account is
registered to "Sam Hughes" with multiple alternate usernames
including, "Cloud Connected LLC" and "Julius."  The records
reveal additional accounts linked this Instagram account,
including "photographer.sam90031@gmail.com" and the
"hughes_sam123" Instagram account.  Additionally, the IP logs
for this account indicate that the 249 IP Address and the 207 IP
Address were also used to login to this account.

        b.  The "julius.caesar411" Instagram account is
registered to the subscriber name "Julius."  "Sam Hughes" and
"Cloud Connected LLC" are listed under the alternate usernames
for this account in addition to "Julius" (an alternate username
also listed for the "byword.photography" and the "hughes_sam123"

Instagram accounts).  The records list the
"julius.caesar411@protonmail.com" account as a linked account.[22]
Additionally, the IP logs for this account indicate that the 249
IP Address and the 40 IP Address were also used to log into this
account.

### 5.    Victims D.B., J.L., and L.L.

34.  On or about January 26, 2020, LAPD received a report
that victim D.B. had received a threatening email from a former
coworker.  D.B. reported that she believed the sender of the
email was HUGHES.  On or about April 13, 2020, victim L.L. also
reported HUGHES to the LAPD for sending him a threatening letter
via the U.S. mail.  Based on my review of the LAPD reports, my
subsequent interviews and follow-up contacts with D.B., L.L.,
and J.L. between June 3 and June 12, 2020, as well as my review
of correspondence between HUGHES and the victims, I learned the
following:

a.    HUGHES and victims D.B., J.L., and L.L. worked
together at Company B, where HUGHES was an independent
contractor for several months prior to his resignation in
January 2020.  D.B. reported that, on or around January 10,
2020, Company B invited approximately 60-70 of its employees to
attend a convention in San Diego.  According to D.B., many of
the female employees reported that HUGHES approached them and
invited them to go to a corner of the room, take a walk, or go
to dinner with him, which most, if not all, politely declined.

---

[22] As detailed above, this account was used to email
threatening messages to both J.C. and E.S.

b.   According to D.B., after the convention ended, HUGHES issued a series of negative posts about American women on the "hughes_sam123" Instagram account.  D.B., L.L. (HUGHES' mentor at Company B), and several other employees noticed the posts and voiced their concerns about HUGHES to the leadership of Company B.

c.   According to L.L., when the leadership of Company B found out about the posts, HUGHES was banned from entering the office space.  The next day, HUGHES submitted his letter of resignation, writing that he felt he was treated unfairly by the other employees.  Shortly after his resignation, HUGHES announced a possible suicide attempt via Instagram.  According to D.B., the employees at Company B, notified the PPD when they saw the post.  According to L.L., around this time, HUGHES also sent an email to Company B that threatened harm to all employees in the office.

d.   On or around January 25, 2020, D.B. received an email from the email account "charlotte.massey400@gmail.com." In the email, the writer told D.B. that her throat was going to get cut and her chest stabbed.  The email also said that, "I know where you are and where to get my gang to kill your members. Fuck you you cunt, theres no point informing authorities before if you do I will kill your loved ones." According to D.B., she believed HUGHES sent the email because she received it shortly after HUGHES was terminated from Company B and she had blocked him on Instagram, and because HUGHES had previously told her that his cat's name was "Charlotte."  The

next day, D.B. reported the message to LAPD officers, telling them she feared HUGHES would carry out his threats.

       e.   Around this time, other individuals who had worked at Company B when HUGHES was an employee also began to receive threats.  Specifically, on or around January 29, 2020, J.L. received an email from the "charlotte.massey400@gmail.com" email account.  In the email, the writer said, in part, that J.L. would "die very soon in the most painful agonising death. . . I know who you are and I know where to find you, and I ask you don't notify the police or anyone because I will kill your loved ones as well."  The writer also threatened to gang rape, stab, and set J.L. on fire.

       f.   According to J.L., she believed the email was sent by HUGHES in retaliation for blocking him on social media. J.L. said she believed that HUGHES possessed the desire and capability to act on his threats of harm.  J.L. said she also knew that HUGHES was aware of the layout of the office building and when the employees congregated for meetings.  Because of this, J.L. said she never stepped foot inside the office building again and eventually quit working at Company B altogether.

       g.   In or around February 2020, L.L., D.B. and another employee at Company B decided to file a restraining order against HUGHES.  According to L.L., on or around March 2, 2020, he visited HUGHES' apartment (the HUGHES Residence) in Pasadena and personally served HUGHES with paperwork notifying him that he would need to appear in court if he wanted to

challenge it.  L.L. said he took multiple photos of HUGHES
holding the paperwork.  I have reviewed these photographs and
the person L.L. identified as HUGHES matches HUGHES' photograph
on file with the California DMV, as well as a photograph of
HUGHES provided to me by the U.S. Department of State.

        h.    According to L.L., he has received numerous
communications from HUGHES since HUGHES resigned from Company B,
sometimes up to three times per week.  L.L. also received
numerous text messages from the HUGHES Phone.

        i.    On or around April 11, 2020, an anonymous letter
addressed the L.L. was sent via the U.S. Postal Service to
L.L.'s aunt and uncle's residence.  According to L.L., he
believed the letter was intended for him since the delivery
address was his former residence.  L.L. reported this
threatening letter to the LAPD on or about April 13, 2020.
Similar to the letter received by J.C., L.L.'s name and address
were handwritten on the envelope but the letter itself was typed
and appeared printed on white computer copy paper.  The writer
stated, in part, "I know where you fucking live . . . You won't
know who this comes from and trust me, it will never land me in
jail to threat you and soon carry it out for real. So don't
bother with police action, because I will kill your loved ones
by cutting their throat and burning their corpse in front of you
. . . I will go after you, kill you by stabbing you in the eyes,
kidnapping you, pouring acid on your fucking face, cut out your
fucking organs while you scream basically you will and there is
nothing you can fucking do about it you east Asian motherfucking

cunt . . . I just will enjoy you facing a gruesome death sentence I will execute . . . How dare you disparage him, go and feed false information to photographers like what you did and alienate him . . . I say police action will end your loved ones lives and don't think I'm bluffing I have a gang to ransack your home and burn it down!!!"

j.    Two days later, L.L. went to LAPD's Mission Area station to file a report.  In addition to reporting the letter sent to his family's home, he also told the LAPD he received a text message from HUGHES on April 2, 2020, threatening to break his jaw.  At that time, L.L. told the LAPD officer that he did not feel threatened by the April 2 text message.

k.    On or around April 17, 2020, L.L. received a direct Instagram message from the Instagram account "catguy100." The writer told L.L., "How fucking dare you mistake me for a stalker and tell me I threatened your family . . . Sending those restraining orders to me with fake evidence . . . You're actions have consequence . . . you miserable cunt . . . Like getting your jaw broken and fucked up . . ."

l.    On or around May 16, 2020, L.L. received a text message from the HUGHES Phone.  In the message, HUGHES stated, in part, that "going to the police about it was an incredibly stupid idea . . . wrong to accuse me of harassing women . . . I

just get it over and done and slash your throat, end your
miserable life . . . Korean pancake faced piece of shit . . ."[23]

       m.  On or around May 17, 2020, L.L. observed a post
on the "byword.photography" Instagram account (the same account
that began to follow victim E.S. on Instagram after she blocked
HUGHES).  The post encouraged its followers to boycott four
different photography groups in the Los Angeles area.  The
caption stated, in part, that "recently these 4 societies of
photographers . . . made unfounded malicious attacks and
accusations brought by a sadistic person called [L.L.] . . .
What they did to get me banned was unfair . . . FYI I am not a
stalker and I give people the utmost respect I am not someone to
make people uncomfortable."  According to L.L., he had
previously contacted the organizations mentioned in the post to
warn them of HUGHES' behavior.

       n.  On or around May 28, 2020, L.L. received
additional text messages from the HUGHES Phone.  In the message,
HUGHES wrote, in part, that he would "come and break your
fucking jaw and rape your girlfriend . . . I'd kill your fucking
loved ones if you ever contact a cop again like that . . .
Fucking Stupid Korean American Cunt . . . I will only stop if
you stop accusing me of harassing women you cunt . . . Or else I

---

[23] In response to HUGHES text messages, L.L. responded to
HUGHES saying he was loser, had no friends, and that it was a
waste of time responding.  Based on my review of this, and
other, correspondence between HUGHES and L.L., L.L. appears to
have gotten upset and responded to HUGHES on multiple occasions.
In response to several threatening texts sent by HUGHES in April
and May 2020, L.L. responded by calling HUGHES derogatory names,
such as "bitch," "fat boy," "stalker, and "psychopath."

will go on to the grave like this . . . I will stop sending you messages if you pay me $250,000 . . . In Significant mental health damages."  He also accused L.L. of being a "fucking nonce" and a "sick paedo cunt."

### 6. Victims E.A. and K.C.

35.  On or about February 2, 2020, victim E.A. reported to the FBI that the matchmaking company she works for ("Company C") had received a threatening email and Facebook review from a man who was later identified as HUGHES.  Based on my review of this FBI report, as well as subsequent FBI interviews with E.A. and victim K.C. on or about March 4, 2020, I know the following:

a.   On or around January 31, 2020, K.C. attended a networking event in Newport Beach, California.  A man with a British accent sat next to and spoke to K.C. at the event.

b.   According to K.C., during the event, K.C. told HUGHES that he was making her uncomfortable and asked him to move seats.  HUGHES complied and they did not interact further at the event.

c.   That same day, on or about January 31, 2020, a Facebook review from the "sam.t.hughes500" Facebook account was posted on Company C's Facebook page.  The post named K.C., and called her a "two faced ignorant person" who does not "deserve to run a dating agency."

d.   On or around February 2, 2020, E.A. (K.C.'s supervisor at Company C) informed K.C. that the company had received an email from the email account "a.total.wanker400@gmail.com."  The subject line of the email

stated "[K.C.] is a Fucking CUNT!!!."  The email stated, "Fuck You, fuck your matchmaking service I will be sure to drop by and stab you to death and anyone who tries to stop me before I put a grenade in your wounds and finish you off, and bomb your office! You will die for your stupidity I can guarantee you and I will kill your loved ones if you notify the authorities!"

    e.    According to E.A., she believed the man at the networking event was HUGHES because a Facebook account with the profile name of "Sam Hughes" (the "sam.t.hughes500" Facebook account) was used to post a negative Facebook review shortly after the event.  She also stated that around this same time, Company C also received the message from "a.total.wanker400@gmail.com", which mentioned K.C. by first name.

    f.    According to E.A., sometime later a second negative review was posted to the company's Facebook page via the "sam.t.hughes500" Facebook account.  The review stated, in part, "[K.C.] is an extremely arrogant woman who is extremely prejudice and rude arrogant and disgusting."

        **7.    <u>Victim S.L.</u>**

    36.    On or about June 1, 2020, victim S.L. reported to the PPD that she had received an anonymous letter threatening to rape and kill her.  The next week, she reported to the PPD that family members had received text messages also threatening to kill her.  Based on my review of the PPD reports, the anonymous letter and texts provided by S.L., as well as conversations with a PPD detective, I know the following:

a.    On or about June 1, 2020, S.L., an employee at a bank in the Pasadena area, received an envelope in the U.S. mail, addressed to her at her workplace.  As with the letters to both J.C. and L.L. (described above), S.L.'s name and work address were handwritten on the envelope but the letter itself was typed and appeared printed on white copy paper.  The letter was titled, "Hello [S.L.'s first name] You Fat Fucking Ginger Bitch."  In the letter, the sender stated, in part "I know who you are and how you ridicule people at your bank . . . I am going to wait outside sometime and wait for you with a carving knife or gun to go either in or out and brutally fuck you up. I am going to get my boys to rape you, slash your fucking throat and stab you in the fucking chest and eyes you will have a very bad day. And if you go to the police on this or try me jailed I will kill your beloved cunting family of yours. I hope you receive this letter and cringe with fear for the rest of your entire fucking life you miserable cunt."  The letter was signed, "From Your Nemisis."[24]

b.    S.L. said she was in fear for her life after reading the letter and was fearful for her and her family's safety.  At that time, S.L. said that she did not know who would want to harm her or who wrote the letter.

c.    A week later, on or about June 7, 2020, S.L. called the PPD again to report that her husband and daughter had received text messages from the HUGHES Phone.  According to

---

[24] As detailed above, on or about November 4, 2019, victim J.C. also received a threatening letter via U.S. mail that was signed "Your Nemisis."

S.L., on or about June 6, 2020, her husband received text
messages from the HUGHES Phone.  The messages said, in part, "I
hope you fucking die! Fat Ginger Armenian Cunt.  I know where
you live and work."  S.L. and her daughter searched the number
on Google and learned that it might be associated with an
individual named "Sam Hughes."  At that time, S.L. said she did
not know the person or know why he would threaten her.

      d.   Subsequently, S.L. called the bank to see if
HUGHES was a client and was informed that HUGHES previously had
an account.  S.L. said she searched for "Sam Hughes" on Facebook
and saw someone with that profile name.  S.L. told the PPD
officers that she thought the individual in the profile photo
for the Facebook account looked familiar.  She then sent the
profile picture to a colleague who also said she recognized him
and that the man was at their bank the previous month.  S.L.
provided a screenshot of the profile to the PPD.  I have
reviewed the screenshot and confirmed it includes a photo of
HUGHES as the profile photo.

      e.   S.L. said that, upon reflection, she remembered
speaking with HUGHES over the phone approximately six weeks
prior about an overdraft alert on his account related to a
deposited check that did not clear.  During the call, S.L.
determined that HUGHES might be the victim of fraud and alerted
him to the fraudulent activity.  HUGHES became upset and
demanded all of his money get returned to his account.  After
S.L. determined HUGHES was a victim, she notified the bank's

fraud department.  When S.L. ended the conversation, she said
she did not suspect any issues.

   f. S.L. told PPD officers that, because of the
threatening letter received at the bank, she has been too afraid
for her life to go to work.  Since receiving the text messages,
she has also been afraid to leave her house and even afraid to
walk to her garage.

  **C. Arrests of HUGHES by the PPD and LAPD and Search of
   the HUGHES Residence and Car**

  37. Based on conversations with PPD and LAPD officers and
detectives, and documents received from the PPD, I learned the
following:

   a. Independent of the FBI's investigation, on or
about June 11, 2020, PPD officers arrested HUGHES at the HUGHES
Residence based on this threats against S.L.  PPD officers
obtained a state search warrant for the HUGHES Residence and
HUGHES' car and seized, among other items, SUBJECT DEVICES 1-4.
According to a PPD detective, HUGHES was in custody on the
Pasadena case from approximately June 11, 2020 to June 23, 2020.

   b. Also independent of the FBI's investigation, on
or about June 25, 2020, HUGHES was arrested by LAPD officers
based on some of the threats sent to victim E.S.  When arrested,
HUGHES was in possession of SUBJECT DEVICE 5, which was
subsequently booked into his property.  HUGHES has remained in
LASD custody since the arrest.

  38. Based on my training and experience in computer-
related investigations, including computer technology threats

cases, I know individuals engaged in cyberstalking and sending threatening communications online sometimes use multiple devices to communicate or connect with victims via multiple online platforms (which can be accessed from various types of digital devices, including smart phones, tablets, laptop computers, and desktop computers) and can use storage devices, like hard drives, to create backups of their digital content. Based on my knowledge of this investigation, I also know that at least three of the victims received typed letters containing threats to injure, rape, and murder the victims, which appear to have been composed using a word processing program (e.g., Microsoft Word) and then printed on computer copy paper.

39. Based on all of the foregoing, I believe there is probable cause to believe that the SUBJECT DEVICES found in HUGHES' residence and on his person will contain evidence of the Subject Offenses.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

40. As used herein, the term "digital device" includes SUBJECT DEVICES 1-5.

41. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained

in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

42.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

48

## VI. <u>CONCLUSION</u>

43.   For the reasons described above, I respectfully submit there is probable cause to issue the requested criminal complaint and arrest warrant, and that there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachments A-1 and A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>10th</u> day of
July, 2020.

_____
UNITED STATES MAGISTRATE JUDGE